## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PETER H. KAMIN, individually,
PETER H. KAMIN PROFIT
SHARE PLAN, AND PETER H.
KAMIN CHILDREN'S TRUST

**09-22829**

CIV-LENARD

Plaintiffs,

CASE NO.:

MAGISTRATE JUDGE
GARBER

vs.

KEVAN D. ACORD,
PHILIP C. GROWNEY,
ALBERTO J. PEREZ,
JOSE G. PEREZ,
SEBASTIAN DE LA MAZA, AND
THOMAS L. BORELL

FILED by __TDS__ D.C.

SEP 2 2 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

Defendants.

_____/

### COMPLAINT

Plaintiffs, Peter H. Kamin ("Kamin"), Peter H. Kamin Profit Share Plan (the "Profit Share Plan"), and Peter H. Kamin Children's Trust (the "Children's Trust"), by and through undersigned counsel, hereby allege:

### I. INTRODUCTION

1.    This case involves insider trading by the Defendants in the securities of Neff Corporation ("Neff"). Defendants unlawfully traded Neff stock on the basis of confidential information obtained by them as insiders of Neff, or predicated upon information tipped to them by Neff insiders.

2.    Defendant, Kevan Acord ("Acord"), an attorney, and Defendant, Philip Growney ("Growney"), an accountant, individually and in their professional capacity as members of

1

Kevan D. Acord, P.A., abused their position of trust and confidence as tax consultants to Neff when they bought $329,000 of Neff stock in the nine (9) days preceding Neff's April 7, 2005 announcement of its Acquisition by Odyssey (the "Acquisition").    Acord and Growney purchased these shares after obtaining confidential information about the Acquisition while they were working for Neff.

3.    Defendant, Alberto Perez ("Perez"), a business associate and close friend of Neff's CEO, Juan Carlos Mas ("Neff's CEO") learned of the possible Acquisition while working at Neff in close proximity with Neff's Due Diligence Team at Neff's headquarters. Perez abused his position of trust and confidence with Neff and Neff's CEO, and misappropriated the information by tipping his brother Jose Perez ("Perez"). The two then used the information to purchase $282,000 of Neff stock in advance of the Acquisition announcement.

4.    Defendant, Sebastian De La Maza ("De La Maza"), the father-in-law of Neff's CEO, learned about the pending Acquisition from his daughter, who is married to Neff's CEO. During the weeks preceding the Acquisition announcement, De La Maza abused his position of trust and confidence with his daughter and misappropriated this information to buy $111,000 of Neff stock.

5.    Defendant, Thomas Borell ("Borell"), a Miami lawyer and close friend of a Neff Director (who is also Neff CEO's brother), misappropriated information about the Acquisition. He abused his position of trust and confidence with the Director and bought more than $1.3 million of Neff stock during the six (6) weeks before the announcement. Borell made many of the stock purchases while he was on a family vacation with the Director. He used a client trust fund account to fund some of the purchases.

6.    By engaging in the conduct described above, and as described more fully herein,

2

each of the Defendants negligently and/or fraudulent caused Plaintiffs to suffer damages.

## II. JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332.  This action arises out of a violation of the laws of the United States, specifically, Section 10(b) of the Securities  Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b and Section 20A of the Securities Act. Likewise, there is complete diversity of citizenship of the parties.  The amount in controversy is in excess of $75,000, which exceeds the statutory requirement for diversity actions.

8.      Pursuant to 28 U.S.C. § 1391, venue is proper in this district a substantial part of the acts, transactions, and courses of conduct giving rise to the violations alleged in the Complaint occurred in the Southern District of Florida. Likewise, Neff was located in Miami at all relevant times, and De La Maza, Borell, and Alberto and Jose Perez all lived in the Miami area. Furthermore, Acord and Growney provided tax consulting services to Neff, had frequent e-mail and telephone contact with Neff officers in Miami, and traded in Neff stock. Likewise, in connection with the conduct alleged in this Complaint, the Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, or the mails.

## III. THE PARTIES

9.      Plaintiff, Kamin, is a resident and citizen of the State of Massachusetts. Commencing in December 2004 through April 6, 2005, Kamin sold shares of Neff stock.

10.      Plaintiff, the Profit Share Plan, was formed and is located in the State of Massachusetts. Commencing in December 2004 through April 11, 2005, The Profit Share Plan sold shares of Neff stock.

3

11.    Plaintiff, the Children's Trust was formed and is located in the State of Delaware. Commencing in December 2004 through April 5, 2005, the Children's Trust sold shares of Neff stock.

12.    Defendant, Acord, 49, is a resident of Overland Park, Kansas. Acord is licensed both as a lawyer and certified public accountant by the states of Kansas and Missouri. Kevan D. Acord is the only named member of Kevan D. Acord, P.A.

13.    Defendant, Growney, 44, is a resident of Kansas City, Missouri. He is a certified public accountant and is employed by Kevan D. Acord, P.A.

14.    Defendant, Alberto Perez, 31, is a resident of Miami, Florida. He is a self-employed real estate consultant.

15.    Defendant, Jose Perez, 34, is a resident of Miami, Florida. For several years, he has been employed by a Miami-based public company that Jorge and Jose Mas, brothers of Neff's CEO, control.

16.    Defendant, De La Maza, 71, is a resident of Miami, Florida. He is a self-employed psychiatrist. His daughter is married to Neff's CEO, Juan Carlos Mas.

17.    Defendant, Borell, 48, is a resident of Miami, Florida, where he is a self-employed lawyer.

## IV. RELEVANT ENTITIES

18.    Neff is a Delaware equipment rental company based in Miami, Florida. Before Odyssey Investment Partners, LLC ("Odyssey") bought it in 2005, Neff's common stock was quoted on the Pink Sheets.

19.    Odyssey is a private equity investment firm based in New York and California.

## V. THE FACTS

## A. Neff's Acquisition Negotiations with Odyssey

20.    In November 2004, Odyssey first contacted Neff about a potential business combination. On November 19, 2004, the parties entered into a confidentiality agreement and commenced negotiations.

21.    In late January 2005, Odyssey offered to purchase Neff for $450 million, which Neff rejected. On February 16, 2005, Odyssey increased its offer to $470 million. Several days later, Neff and Odyssey executed a letter of intent for Odyssey to purchase Neff, along with a 30-day exclusivity agreement. Extensive due diligence began shortly after that and continued for several weeks at Neff's Miami headquarters and other branch locations. During this time, Neff's CEO routinely updated Neff's board of directors about the Acquisition negotiations.

22.    On March 4, 2005, Neff sent Odyssey a draft Acquisition agreement. During the next several weeks, the parties' representatives continued to discuss, review, and negotiate the terms of the agreement and other transaction documents.

23.    Neff's board of directors met on April 6, 2005 and approved the Acquisition. The next day, Neff announced that Odyssey was buying it for an estimated price of $8.19 to $8.27 per share. The day of the announcement, Neff's stock price increased 51%, closing at $7.41 per share, with 1.2 million shares traded -compared to 58,419 shares the day before. The Acquisition closed on June 3, 2005. Neff's stockholders received $8.21 per share in exchange for their stock on June 7, 2005.

## B. Insider Trading by Acord and Growney

24.    From 2003 until the Neff Acquisition, Acord and Growney prepared Neff's tax returns, assisted in the preparation of the tax footnotes to the company's financial statements, and provided Neff miscellaneous tax and legal advice both in their individual capacity, as well as in

their professional capacity for Kevan D. Acord, P.A. As a result, Acord and Growney communicated regularly with Neff's management and had access to confidential information about Neff's business operations.

25.    On January 6, 2005, Neff's CFO sent Acord and Growney a series of e-mails seeking their advice on the tax-related consequences of a potential change in Neff's ownership on the company's net operating losses. In particular, Neff's CFO wanted to know whether Neff's net operating losses would have any value to a prospective purchaser or new owner of the company. After speaking with Growney, Acord sent Neff's CFO an e-mail containing some information on the issue and offering to discuss the matter in greater detail.

26.    The following day, Neff's CFO sent Acord another e-mail requesting more information about the tax implications of an ownership change. Acord again provided additional information concerning the issue but remarked, "this area is complex and any transaction would need to be scrubbed from a tax perspective for its actual impact on the utilization of Neff's net operating losses." A short time later, Neff's CFO responded that the information Acord provided was sufficient, but added, "we'll obviously need to dig deeper if the transaction materializes."

27.     Odyssey's tax consultants subsequently requested in early March 2005 that Acord and Growney provide them with Neff's prior year tax and financial documents. Growney immediately contacted Neff's Director of Financial Reporting for authority to release this confidential information. Neff authorized Acord and Growney to provide the requested documents to Odyssey's tax consultants, and further instructed Acord and Growney to answer all of their questions.

28.     Acord and Growney's time slips for services provided to Neff during March 2005 indicate they both assisted Neff in connection with Acquisition due diligence. Growney's time slip for March 1, 2005 indicated that he provided "due diligence assistance" by responding to numerous requests from Odyssey's tax consultants for details of the previous year's tax returns, net operating losses, and other tax issues.

29.     Acord's time slip for March 7, 2005 stated: "Due Diligence items for [Odyssey's tax consultants]; discussion with Neff's CFO." His time slip for the next day stated "Consultation regarding Acquisition due diligence. . ." Acord's time slip for March 10, 2005 stated: "Discussion with [Odyssey's tax consultants] regarding tax due diligence." On March 29, 2005, Acord wrote on a time slip that he spent an hour discussing tax representation associated with "proposed business transaction."

30.     Also on March 29, Neff's Director of Financial Reporting sent Growney an e-mail asking him to confirm the accuracy of a list of seven management representations relating to tax matters. One of the representations listed in the e-mail related to tax considerations after or prior to the "Closing Date." Moreover, the term "Closing Date" was used no less than three times in this particular management representation.

31.     Only minutes after receiving that e-mail, Growney sent Neff's Director of

7

Financial Reporting an e-mail stating, "[p]lease fill me in as to what the term closing date is referring to."

32.    A short time later, Neff's Director of Financial Reporting sent Neff's CFO an e-mail stating, "I thought you had discussed this transaction with K[evin] Acord a little? Do you want to fill them in on this now? Do you want me to give them a call?" Neff's CEO responded, "I have not clued them in, but go ahead." Neff's Director of Financial Reporting called Growney within the hour and spent about ten minutes discussing the Odyssey Acquisition.

33.    Within an hour of that phone call, Acord bought 2,200 Neff shares for his personal account and 2,100 shares for the account of one of his long time clients (the "Client Account"). He had never before bought Neff stock.

34.    The next day, Acord transferred $300,000 to the Client Account from another securities brokerage account the client owned. Acord used these funds to purchase 52,684 additional shares of Neff stock for the Client Account over the next seven days. Acord's largest purchase of Neff shares for the Client Account (20,000 shares) occurred on April 6, 2005, one day before the Acquisition announcement.

35.    Following the Acquisition, Acord exchanged the 2,200 Neff shares in his personal account for a profit of $7,719. Acord also exchanged the 54,784 Neff shares in the Client Account for a profit of $146,572.

36.    Growney also traded in Neff stock. On March 23, 2005, amidst the due diligence assistance he and Acord were providing Neff, Growney made his first-ever purchase of Neff stock when he bought 3,000 shares in one of his brokerage accounts. Six days later -the same day Neff's Director of Financial Reporting told him about the Odyssey deal -Growney bought an additional 400 shares in another brokerage account. Finally, on April 1, 2005, six days before the

8

Acquisition announcement, Growney purchased an additional 250 shares in a third brokerage account.

37.    Following the Acquisition, Growney sold his Neff stock for a profit of $12,954.

### C. Insider Trading by Alberto and Jose Perez

38.    Alberto and Jose Perez are long-time friends and business associates of Neff's CEO and his two brothers, Jorge Mas and Jose Mas, both former Neff directors. The Perez' relationship with the Mas brothers dates back more than 20 years to when their fathers co-founded the predecessor company to Neff.

39.    For more than five (5) years, Alberto Perez has managed real estate projects the Mas brothers own. He also serves as an officer for one their companies, has signatory authority over several related bank accounts, and is a partner in at least one of their real estate projects.

40.    Jose Perez also maintains an ongoing business relationship with the Mas Brothers. For several years, Jose has worked at MasTec, Inc. a publicly-traded company the Mas family controls. He also previously worked at Neff.

41.    As a result of their close friendships and business relationships with the Mas brothers, the Perezes are in almost daily contact with them about business and personal matters. During the Odyssey negotiations, Alberto Perez communicated with Juan Carlos Mas almost on a daily basis concerning the real estate projects he managed for the Mas brothers. Furthermore, Juan Carlos Mas routinely entrusted confidential information to Perez in connection with these projects and other business interests.

42.    Several months before the Odyssey/Neff negotiations began, Neff's CEO gave Alberto Perez an office at Neff's headquarters to facilitate their frequent business meetings. The office was located on the executive floor among the offices of Neff's senior management. Perez

used this office regularly during the Odyssey negotiations and while Odyssey conducted due diligence at Neff's headquarters.

43.    During the negotiations, Alberto Perez met with Neff's CEO almost daily, and communicated regularly with several other Neff managers close to the negotiations, including Neff's general counsel and several regional vice-presidents. Because of his close business relationship with Neff's CEO, Perez had unrestricted access to Neff's headquarters, including Neff's CEO's office where Neff's CEO kept a "deal file" in an unsecured location. In addition, documents relating to the deal were often sent to Perez's assistant's fax machine, where he had ready access to them.

44.    Alberto Perez's office at Neff was two doors down from a conference room used by the due diligence teams visiting Neff's headquarters during the first two weeks of March 2005. During this time, at least 20 outsiders were working in the conference room on the deal at any given time. Moreover, the due diligence teams had to walk past Alberto Perez's office each day to reach the conference room.

45.    Through this constant access to confidential information about the Neff-Odyssey deal, Alberto Perez learned the Acquisition was pending. He then told his brother Jose Perez about the transaction. Alberto and Jose are close, and talk several times a day by phone. Alberto Perez gained or expected to gain a personal benefit by providing this valuable information to a close relative.

46.    The Perez brothers jointly owned a securities brokerage account that they had opened to deposit an $800,000 inheritance from their father. Both Alberto and Jose Perez traded in the account and talked regularly to their broker. In fact, on many occasions, the broker discussed the account's trading with both Perez brothers on the phone.

47.     In 2004, the Perez' account suffered large trading losses. Between January and October of that year, the joint account lost $151,000. As of December 2004, the account also had a margin debit balance of $255,000, or 36% of the account's total value. On December 8, 2004, the Perez' broker wrote them to notify them about the trading losses and the large margin balance, and to warn them about the risks of active trading. As a result, the brothers agreed to slow their trading activity and adopt more of a "buy and hold" investment approach.

48.     Against this backdrop, just two days after the due diligence teams arrived at Neff's headquarters and began working out of the conference room next door to Alberto Perez's office, the Perez brother's joint account bought 17,000 shares of Neff stock. This was the first time the Perez brothers had ever purchased Neff stock.

49.     Moreover, just two days earlier, after a half-hour call between Alberto Perez and the broker, the brothers' account began selling a large amount of recently-acquired shares in MasTec. The brothers used the proceeds from these sales to buy Neff stock.

50.     During the next few weeks, the Perezes continued selling MasTec stock and using the money to buy Neff shares. In all, the joint account bought $282,000 of Neff stock in March 2005, the largest position in a single company the brothers had ever taken.

51.     Following the Acquisition, the Perezes exchanged 83,000 Neff shares for a profit of $399,000.

### D. Insider Trading by De La Maza

52.     De La Maza's daughter, Vivian Mas, has been married to Neff's CEO for more than 14 years and has two young children. De La Maza and his wife are extremely close to their daughter and her family. They live only seven miles from their daughter's home and regularly provide childcare to their young grandchildren. As a result, De La Maza and his wife visit their

11

daughter several times weekly, and speak to her numerous times a day by telephone.

53.    Vivian Mas learned about the Odyssey-Neff negotiations from her husband in February or March 2005, around the time that Odyssey and Neff executed a letter of intent for $470 million and Odyssey began due diligence at Neff's headquarters.

54.    At the same time, De La Maza and his wife were having frequent conversations with their daughter about an upcoming cruise the families were scheduled to take, and whether the Neff CEO's busy schedule would preclude the daughter's family from going. On March 22, 2005, De La Maza's daughter decided to make the final down payment on a cabin for her family, but told her parents her husband still might not be able to go.

55.    Through his constant contact with his daughter, De La Maza learned of the Odyssey-Neff negotiations. On March 16, 2005 he made his first purchase of Neff shares. Prior to this purchase, he had not bought Neff stock in more than three years.

56.    Between March 16 and April 4, 2005 three days before the Acquisition announcement, De La Maza bought Neff stock 14 times, purchasing 23,800 shares for $111,000. In contrast, in the previous year, De La Maza had made no trades in his wife's IRA, only a handful of trades in a joint account, and averaged less than one transaction a month in his IRA.

57.    Following the Acquisition, De La Maza exchanged the Neff shares for a profit of $84,000.

### E. Insider Trading by Borell

58.    Borell is a long-time friend of Jose Mas, a Neff director during the Acquisition negotiations and a brother of Neff's CEO.  Borell and Mass have known each other for more than six years. In addition, their wives are close friends, and their children attend the same school and are close friends.

12

59.    Borell and Mas see each other frequently at their children's school functions, sporting events, and birthday parties. Borell and his wife also socialize with Mas and his wife. They have often been guests at each other's homes for dinners and parties, and they attend the same church.

60.    Moreover, Borell and his family have been guests of Mas at his vacation home in the Bahamas. Their families have also vacationed together annually for years with ski trips to Colorado and visits to Walt Disney World in Orlando, Florida. During these various social events and vacations, Borell, Mas, and their wives have frequently discussed personal and family matters.

61.    Between March 10 and March 13, 2005, during the height of the Acquisition negotiations, the Borell and Mas families traveled to Walt Disney World (with others). The families stayed at the same hotel and socialized and dined together.

62.    Eleven days later, between March 24 and April 1, 2005, Borell's family traveled with the Mas brothers and their families and others to Vail, Colorado. All of the families stayed at the same resort and socialized and dined together.

63.    As a result of his close relationship and frequent contacts with Jose Mas, Borell had access to confidential information about the Neff-Odyssey Acquisition negotiations.

64.    In mid-January 2005, Borell transferred approximately $1 million from his client trust account to his personal brokerage account. Several weeks later, on Monday, February 28, 2005 -the day the due diligence teams arrived at Neff's headquarters -Borell began buying Neff stock. At the time, he had borrowed more than $250,000 from various relatives, which he was attempting to repay.

65.    During the ensuing week, Borell purchased 59,000 Neff shares. In the five weeks

between February 28 and April 4, 2005 -three days before the Acquisition announcement Borell purchased 300,000 shares of Neff stock at a cost of more than $1.3 million.

66.     Before this, Borell had bought Neff stock only one other time, in 1999, which he sold for a loss of approximately $4,000.

67.     Furthermore, Borell purchased the majority of his Neff stock, 178,000 shares, during his vacation with Jose Mas. While at Walt Disney Worlds between March 10 and March 13, 2005, Borell called his broker in Miami 20 times and purchased 6,100 shares of Neff stock. During the nine-day Colorado ski trip, between March 24 and April 1, 2005, Borell called his broker more than 50 times and purchased 171,894 shares of Neff stock.

68.     In the weeks following the announcement of the Acquisition, Borell sold his Neff stock for a profit of $974,859.

## VI. THE CLAIMS

### COUNT I
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
### And Rule 10b-5 [17 C.F.R. § 240.10b-5]

69.     Plaintiff repeats and realleges paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70.     Acord and Growney, by virtue of their work for the company, knew or were extremely reckless in not knowing they possessed material, non-public information about the possible Acquisition of Neff. On the basis of this material, non-public information and in breach of their fiduciary duty or similar duty of trust and confidence to Neff and its shareholders, Acord and Growney purchased shares of Neff stock.

71.     Alberto Perez, by virtue of his close relationship with Neff's CEO as well as his work at Neff's offices, knew or was extremely reckless in not knowing he possessed material,

14

non-public information about the possible Acquisition of Neff. In breach of his fiduciary duty or similar duty of trust and confidence to Neff, its shareholders and Neff's CEO, he disclosed the information to Jose Perez and purchased shares of Neff stock. To the extent the Acquisition information came from Neff's CEO, Alberto Perez knew or should have known that Neff's CEO disclosed such information in breach of his fiduciary duties to Neff and/or Neff's shareholders and that Neff's CEO sought to benefit, directly or indirectly, from his disclosure to Alberto Perez.

72.    Alberto Perez tipped the confidential Acquisition information to his brother, Jose Perez. By virtue of his close relationship with Alberto Perez, Neff's CEO and Neff's CEO's brothers, Jose Perez knew or was extremely reckless in not knowing he possessed material, non-public information about the possible Acquisition of Neff. On the basis of this material, non-public information, Jose Perez breached his duty of trust and confidence to the tippers and purchased shares of Neff stock. Jose Perez knew or should have known that the tippers disclosed the Acquisition information in breach of their fiduciary duties to Neff and/or Neff's shareholders. The tippers sought to benefit, directly or indirectly, from their disclosure to Jose Perez.

73.    De La Maza knew or was extremely reckless in not knowing he possessed material, non-public information about the possible Acquisition of Neff. On the basis of this material, non-public information and in breach of his duty of trust and confidence to his daughter (Neff's CEO's wife), De La Maza purchased shares of Neff stock. De La Maza knew or should have known that his daughter disclosed the Acquisition information in breach of her fiduciary duty to Neff and/or Neff's CEO, her husband. De La Maza' daughter sought to benefit, directly or indirectly, from her disclosure to De La Maza.

74.    Borell knew or was extremely reckless in not knowing he possessed material,

non-public information about the possible Acquisition of Neff. On the basis of this material, non-public information and in breach of his duty of trust and confidence to Jose Mas, Borell purchased shares of Neff stock. Borell knew or should have known that Jose Mas disclosed the Acquisition information in breach of his fiduciary duty to Neff, Neff's shareholders and/or Neff's CEO. Borell sought to benefit, directly or indirectly, from his disclosure to Borell.

75.    None of the Defendants disclosed the material, non-public information about the possible Acquisition of Neff to the investing public.

76.    By their conduct described above, the Defendants, directly and indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

77.    By reason of the foregoing, the Defendants directly or indirectly, violated Section l0(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b

**WHEREFORE**, Plaintiff respectfully requests this Court to award damages in his favor, against the Defendants, together with interest and costs, and for such further relief as this Court deems just and proper.

## COUNT II
### Violations of Sections 20A of the Securities Act

78.    Plaintiff repeats and realleges paragraphs 1 through 77 of this Complaint as if fully set forth herein.

79.     As set forth above in Count I, and by reference incorporated herein, Defendants are violators of Section 10(b) and Rule 10b-5, promulgated thereunder.

80.     Plaintiffs sold Neff stock contemporaneously with the Defendants' unlawful trading of Neff shares, as further described herein. At the time of each of these transactions, Defendants were in possession of material, non-public information regarding the Acquisition, and knew that the information had not been publicly disclosed to other investors.

81.     Defendant, Acord, as an attorney and tax consultant to Neff, abused his position of trust and confidence as an insider to Neff by misappropriating material, non-public information and purchasing $329,000 of Neff stock predicated upon such information.   On March 29, 2005 Acord bought 2,200 Neff shares for his personal account and 2,100 shares for the account of one of his long time clients.  Commencing on March 30, 2005, Acord purchased 52,684 additional shares of Neff stock for the Client Account over the next seven days. Acord's largest purchase of Neff shares for the Client Account (20,000 shares) occurred on April 6, 2005, one day before the Acquisition announcement. Following the Acquisition, Acord exchanged the 2,200 Neff shares in his personal account for a profit of $7,719. Acord also exchanged the 54,784 Neff shares in the Client Account for a profit of $146,572.

82.     Defendant, Growney, as a tax consultant to Neff, abused his position of trust and confidence as an insider to Neff by misappropriating material, non-public information and purchasing Neff stock predicated upon such information.  On March 23, 2005, Growney bought 3,000 shares in one of his brokerage accounts. Six days later, on March 29, 2005, Growney bought an additional 400 shares in another brokerage account. Finally, on April 1, 2005, Growney purchased an additional 250 shares in a third brokerage account. Following the Acquisition, Growney sold his Neff stock for a profit of $12,954.

17

83.    Defendants, Alberto Perez and Jose Perez, as business associates working at Neff's offices and/or as close friends of Neff's CEO and Neff's CEO's brothers, abused their position of trust and confidence by misappropriating material, non-public information and purchasing Neff stock predicated upon such information. In March 2005, the Perez brother's joint account bought $282,000 of Neff shares. Following the Acquisition, the Perez brothers exchanged 83,000 Neff shares for a profit of $399,000.

84.    Defendant, De La Maza knew or had reason to know that his daughter, who is married to Neff's CEO, disclosed the Acquisition information in breach of her fiduciary duty to Neff and Neff's CEO. De La Maza breached his duty of trust and confidence with his daughter and misappropriated the material, non-public Acquisition information to buy Neff stock. From March 16, 2005 to April 4, 2005, De La Maza bought Neff stock 14 times, purchasing 23,800 shares for $111,000. Following the Acquisition, De La Maza exchanged the Neff shares for a profit of $84,000.

85.    Defendant, Thomas Borell ("Borell"), a close friend of Neff Director, Jose Mas (who is also Neff's CEO's brother), misappropriated information about the Acquisition. He abused his position of trust and confidence with the Director and bought more than $1.3 million of Neff stock during the six (6) weeks before the announcement, much of it while he was on a family vacation with the Director. He used a client trust fund account to fund some of the purchases. Specifically, in the five weeks between February 28, 2005 and April 4, 2005, Borell purchased 300,000 shares of Neff stock at a cost of more than $1.3 million (Specifically, between March 10. 2005 and March 13, 2005, Borell purchased 6,100 Neff shares and between March 24, 2005 and April 1, 2005, Borell purchased 171,894 Neff shares). In the weeks following the announcement of the Acquisition, Borell sold his Neff stock for a profit of

$974,859.

86.     When Defendants purchased Neff securities as set forth above, they knew or acted in reckless disregard of the fact that: (1) they possessed confidential information that Odyssey had proposed buying Neff; and (2) that the conveyance of this material and confidential information to them constituted a breach of a fiduciary duty, contractual duty, or other duty arising out of a relationship of trust and confidence.

87.     By reason of the foregoing, the Defendants, acting singly or in concert, directly or indirectly, violated Sections 20A and 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder, and are jointly and severally liable thereunder.

88.     Plaintiffs sold Neff stock contemporaneously with the Defendants unlawful trading.

89.     Defendants unlawful trading caused Plaintiffs to engage in detrimental trading and Defendants' omissions and misconduct caused Plaintiffs harm.  Specifically, as set forth above, Defendants caused Plaintiffs to suffer damages as:  (a) Plaintiffs have suffered substantial damages as they sold Neff stock at artificially deflated prices as a result of the Defendants' violations; and (b) would not have traded Neff stock at the prices they bought/sold at, or at all, if they had been aware that the market prices had been artificially deflated by Defendants' misconduct.  Plaintiffs relied on the integrity of the market to their detriment.

90.     Pursuant to Section 20A of the Securities Act, Plaintiffs seek the ill-gotten profits gained by the Defendants from the transactions that are the subject of the violations set forth herein.

**WHEREFORE**, Plaintiff respectfully requests this Court to award damages in his favor, against the Defendants, together with interest and costs, and for such further relief as this Court

deems just and proper.

<b><u>COUNT III</u></b><br><b>Negligence</b>

91.    Plaintiff repeats and realleges paragraphs 1 through 90 of this Complaint as if fully set forth herein.

92.    Defendants had a duty to Plaintiffs to use the degree of care, knowledge and skill ordinarily possessed by an officer, director, manager, insider and/or other individual in possession of material, non-public information about Neff.

93.    Plaintiffs, as investors and shareholders of Neff, relied upon Defendants' fair and good-faith dealings.

94.    Defendants had actual knowledge and/or should have known that Plaintiffs, as shareholders, were relying upon their good faith and fair dealing. Defendants therefore owed a duty of care to Plaintiffs to exercise reasonable care in communicating information about Neff and in lawfully and properly trading Neff shares.

95.    Defendants breached their duty of care to Plaintiffs by exploiting their respective relationships with Neff (and related parties) and by surreptitiously and illicitly trading Neff's shares.

96.    Plaintiff reasonably relied upon Defendants to their detriment.

97.    As a consequence of Defendants' negligence, Plaintiffs suffered damages. Defendants' negligence directly and proximately caused Plaintiffs to incur substantial damages.

**WHEREFORE**, Plaintiff respectfully requests this Court to award damages in his favor, against the Defendants, together with interest and costs, and for such further relief as this Court deems just and proper.

## COUNT IV
**Fraud**

98.     Plaintiff repeats and realleges paragraphs 1 through 90 of this Complaint as if fully set forth herein.

99.     Defendants knowingly and intentionally made misrepresentations and omissions of material fact relating to Neff, the Acquisition and Neff securities.

100.    Defendants defrauded Plaintiffs by engaging in the deceitful and fraudulent conduct set forth above through a device, scheme and artifice that constitutes common law fraud.

101.    Each of the Defendants' misrepresentations and omissions were material, and operated as a fraud upon Plaintiffs. Defendants' material misrepresentations and omissions were false or were made with reckless disregard for the truth.

102.    Plaintiffs relied to their detriment, on Defendants' false and misleading material misrepresentations and omissions.

103.    Defendants were aware that Plaintiffs, as shareholders and investors, as well as other Neff investors, were relying upon their misrepresentations or omissions.

104.    As a direct and proximate cause of Defendants' violations, Plaintiffs were damaged.

**WHEREFORE**, Plaintiff respectfully requests this Court to award damages in his favor, against the Defendants, together with interest and costs, and for such further relief as this Court deems just and proper.

### VII. JURY DEMAND

Plaintiffs demand a trial by jury.

Respectfully submitted,

Walter J. Mathews
Fla. Bar No. 0174319
wjmathews@wjmlawfirm.com
Walter J. Mathews, P.A.
Attorneys for Plaintiffs
Courthouse Law Plaza
700 SE Third Avenue, Suite 300
Fort Lauderdale, Florida 33316
Tel:    (954) 463-1929 Fax: -1920

By:    _____
            Walter J. Mathews

JS 44 (Rev. 2/08)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

### I. (a) PLAINTIFFS

PETER H. KAMIN, individually, PETER H. KAMIN PROFIT SHARE PLAN, AND PETER H. KAMIN CHILDREN'S TRUST

**DEFENDANTS**

KEVAN D. ACORD, PHILIP C. GROWNEY, ALBERTO J. PEREZ, JOSE G. PEREZ, SEBASTIAN DE LA MAZA, AND

09-22829

**(b)** County of Residence of First Listed Plaintiff  Hampden County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Johnson County
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)  954-463-1929
Walter J. Mathews, P.A.
Courthouse Law Plaza
700 S.E. Third Avenue, Suite 300
Fort Lauderdale, Florida 33316

Attorneys (If Known)

FILED by ___ D.C.

SEP 22 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. — MIAMI

**(d)** Check County Where Action Arose: ☑ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

MAGISTRATE JUDGE
GARBER

09-CV-22829-Lenard/Garber

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) |
|---|---|

(For Diversity Cases Only)

| | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| ☐ 2 U.S. Government Defendant | ☑ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| | | Citizen or Subject of a ☐ 3 Foreign Country | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** — **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane  ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product  Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability  ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &  Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander  ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'  Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability  Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine  **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product  ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability  ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☑ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle  ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle  Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability  ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal  Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**  **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting  ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment  Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/  **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations  ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare  ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities  ☐ 540 Mandamus & Other | ☐ 462 Naturalization | | |
| | Employment  ☐ 550 Civil Rights | Application | | ☐ 950 Constitutionality of State |
| | ☐ 446 Amer. w/Disabilities  ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien | | Statutes |
| | Other | Detainee | | |
| | ☐ 440 Other Civil Rights | ☐ 465 Other Immigration | | |
| | | Actions | | |

### V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed- (see VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).**  (See instructions second page):

a) Re-filed Case ☐ YES ☑ NO    b) Related Cases ☐ YES ☑ NO

JUDGE _____  DOCKET NUMBER _____

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity): 28 U.S.C. §1331 and 1332; Insider trading action.

LENGTH OF TRIAL via 10 days estimated (for both sides to try entire case)

| VIII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ☑ Yes ☐ No |
|---|---|---|---|

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD  _(signature)_    DATE 9/21/09.

FOR OFFICE USE ONLY
AMOUNT $350  RECEIPT # 00885
09/22/09